RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-1909

ARONE MCCONER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-80213—Nancy G. Edmunds, District Judge.

Argued: June 3, 2008

Decided and Filed: June 27, 2008

Before: ROGERS, COOK, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Todd A. Shanker, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Todd A. Shanker, David C. Tholen, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge. Arone McConer appeals his criminal conviction and sentence. McConer and a handful of other individuals were present at 4062 Lawrence Street in Detroit, Michigan, when the apartment was raided by police. Narcotics and weapons were found in the apartment, and McConer was charged in state court with possession with intent to deliver both cocaine and marijuana, felon in possession of a firearm, and habitual felony firearm. The State informed him that if he pled guilty as charged, his case would not be referred for federal prosecution. McConer did not plead guilty, however, and the State dismissed its case when a criminal complaint was filed against McConer by the federal government. On this appeal from his federal conviction, McConer argues that the district court misinterpreted its authority to remedy the errors McConer perceived in his state proceedings; that his statements to one of the police officers were introduced in violation of *Miranda*; that his right to a fair trial was violated by the introduction of prejudicial evidence in violation of the district court's exclusion orders; and that his sentence is procedurally

1

and substantively unreasonable. Because reversal is not warranted by any of McConer's arguments, we affirm his conviction. The district court misstated its sentencing standard, however, and we vacate McConer's sentence and remand for resentencing under the proper standard.

## I. Background

On January 19, 2005, nine Detroit police officers executed a search warrant at 4062 Lawrence Street, the upper-level unit in a two-family duplex. Officer Hughes was the first to enter the apartment. As he entered, he saw Kanota Thompson in the living room with his hands up. He also saw the defendant, Arone McConer, running from the southeast bedroom through the living room, into the kitchen, and down the back stairs. McConer ignored Officer Hughes's orders to stop and freeze, and Hughes followed him into the basement. Upon detaining him, Officer Hughes patted McConer down for weapons and found none. Hughes led McConer up to the first floor, where the other officers handcuffed him and eventually returned him to the second-floor apartment where Kanota Thompson was being detained.

Officer Penn, who entered the apartment after Officer Hughes, saw Hughes running toward the kitchen when the officers first entered the apartment. He also saw Brian McConer, Arone's cousin, run from the bathroom into the kitchen and throw cocaine packaged in nine Ziploc bags on the floor as he ran. Officer Penn eventually found Brian under a bed in the first-floor unit and arrested him.

Once the house was secured and all of its occupants were in a central location, Officer Hamilton formally arrested Arone McConer. During a search incident to the arrest, Hamilton found two house keys in McConer's pants pocket. One of the keys fit the front door of the residence, and the other fit the steel grate on the front door.

In searching the upper-level unit, Officer Hughes found 24.32 grams of cocaine base in a dresser drawer in the southeast bedroom from which McConer had fled. The cocaine had not yet been broken down for sale and had a street value of between $6,000 and $12,000. Officer Jarmons recovered 368.56 grams of marijuana from the bedroom, packaged for distribution, along with two digital scales and empty sandwich and Ziploc bags. Jarmons also recovered a loaded .38 caliber revolver handgun from the top of the dresser. Based on the quantity of marijuana, cocaine, and money recovered, Officer Hughes concluded that the house was likely used as "a stash house, or a wait spot, a spot where they're holding large quantities of narcotics used for sales, either broken down there and transported to other places, or actually done out of that location."

Officers Hughes and Jarmons also found paperwork in Arone McConer's name, including receipts, in the bedroom dresser. The documents included letters McConer had mailed to his girlfriend during a previous stint in prison, a traffic ticket addressed to McConer, a court document addressed to McConer, and McConer's prison identification card bearing his picture. Six envelopes listed McConer's address as 461 West Savannah, and the traffic ticket listed his address as 9639 Stahelin. None of the items were addressed to McConer at the searched residence.

Meanwhile, McConer was being detained in the living room. As all of the evidence was being brought to the front room of the apartment, McConer saw the cocaine, the paperwork, and the gun. At some point, McConer signaled to Officer Hughes that he wished to speak with him privately, and Officer Hughes took McConer into the bedroom. Without any prompting or questioning by Officer Hughes, McConer volunteered that he had just gotten out of prison and that he could not be around guns or dope. While the exact phrasing is not clear from the record, Hughes then appears to have asked McConer either where he lived, or if he lived at the searched residence. McConer stated either that he used to live at the residence, or that he does not live there anymore. Although it appears most likely that McConer's statements about his living situation were made in

response to Hughes's question, a portion of Hughes's testimony indicates that McConer may have volunteered this information:

> THE COURT: Well, I don't know what you are saying. When are you saying he didn't live there?
>
> A: The first interview he said that.
>
> THE COURT: You mean—what are you describing as the first interview?
>
> A: Well, when he came in there and when all the narcotics and the weapon came out of there, even though—and the paperwork. He had paperwork that was brought in there stating that he lived there. He just told me "I just got out of prison, I don't even live here anymore," something like that.

JA 267. After this exchange, Hughes told McConer that "we'll get this all down on paper in a little while" and that he should go back to the living room to relax. Hughes testified that he did not give McConer *Miranda* warnings during the bedroom conversation and that the exchange lasted less than a minute.

After the search was completed, Officer Hughes interviewed McConer formally in the kitchen. This time, he gave McConer *Miranda* warnings, and McConer signed a waiver form. Hughes then produced a Detroit Police Department interrogation form, which also contained a statement of constitutional rights. Hughes read the rights to McConer again, and McConer signed the second form. McConer then agreed to give a statement. Hughes testified that while he was writing out the questions that he intended to ask McConer, McConer was panicky and kept asking questions, including "how much time could I get for this," and repeated that he "didn't live here anymore, . . . I can't be around any of this stuff, man. You just don't know." Officer Hughes received the following answers to the questions that he had written:

1. Do you understand your constitutional rights? "Yes."

2. How long did you live at this location? "For a few months."

3. How much cocaine was in the bedroom? "I don't even know."

4. How long has the pistol been in the bedroom? "I don't know."

5. Why was all of your IDs & paperwork in the front bedroom? "I left all my paperwork & the [toy] motorcycle here when I left."

JA 33. McConer initialed each answer and signed his name at the bottom of the interrogation form.

Upon leaving the apartment, Officer Smith asked McConer which coat was his, and McConer pointed to a coat hanging on the door of the southeast bedroom. Officer Russell retrieved the coat and gave it to McConer. Earlier during the search, Russell had searched the coat and retrieved $6,278 in cash. Officer Russell testified that the particular cash denominations led him to believe that drug trafficking was occurring.

In January 2005, Arone McConer was charged in Michigan state court with possession with intent to deliver less than 50 grams of cocaine, felon in possession of a firearm, possession with intent to deliver marijuana, and habitual felony firearm. At a "pre-exam" hearing on January 27, the state prosecutor stated that if McConer "were to plead guilty as charged including the habitual this case would not be referred to the federal gun program," referring to Project Safe Neighborhoods,

which is "a joint effort between the federal government and . . . state authorities to address problems related to gun violence." *United States v. Morris*, 470 F.3d 596, 598 (6th Cir. 2006). The state prosecutor did not offer McConer a plea agreement for a reduced plea or sentence. McConer elected not to plead guilty, and instead to take the matter to a preliminary examination. The state court explained to McConer that state and federal courts share joint jurisdiction in Project Safe Neighborhoods cases, and that sometimes such cases can be referred to and taken by the federal courts. The state judge explained that "[o]bviously, there are greater or more severe penalties in the federal system," but indicated that he agreed with McConer's decision to "roll the dice" on the preliminary exam. The state judge warned, however, that "[u]nderstanding that, the offer as stated would be withdrawn. I don't know if this matter will in fact be referred to the Feds but the option is available to the People." The prosecutor then reiterated:

> [PROSECUTOR]: Just so we're clear it's the indication that it's going to be referred to the federal government.
>
> [COURT]: A referral will be made?
>
> [PROSECUTOR]: Yes.

JA 53.

Less than one week later, the federal government filed its criminal complaint against McConer. On the morning of a February 11 calendar conference in state court, the state moved to dismiss its case, noting that the federal government had issued a warrant for McConer and seeking to avoid duplicative prosecution on the same facts. At that point, McConer's substitute lawyer indicated to the state court that McConer desired to enter a plea, and McConer asked to wait for his own attorney. When his attorney arrived, the attorney explained that he had advised McConer to plead guilty on numerous occasions, but that McConer had refused to do so:

> [DEFENSE COUNSEL]: Robert Slameka for Mr. McConer, your Honor.
>
> I thank [the Prosecutor] for being here because this will be the seventh time that this has happened. . . . I discussed it at the jail, discussed three times in the lock-up, discussed at two hearings before that—does he want to plead guilty? No. Told him the repercussions would be—Now he's shaking his head—I'm getting to the repercussions would be the Feds were coming for him.
>
> This week . . . the Feds showed up untimely, so that's why we're here. I spoke to the prosecutor, I said my client today wants to plead guilty. And I have been informed he cannot because the Feds have already got a complaint and warrant and they have now jurisdiction, meaning you, I, the prosecutor, has no control over the case anymore.
>
> I just want the record to reflect that this will be the seventh time we've discussed this.

JA 89. The prosecutor then explained that he had never offered McConer a reduced plea:

> [PROSECUTOR]: I'd like to also make a record because some of these cases, in fact, are going to the Federal Government where Defendant makes allegations that are not true.
>
> My record here, to make it clear, I never offered this Defendant any guilty plea of any kind – any reduced plea, sorry. But the law says that as long as a case

is pending, a Defendant can walk in court any time and, if the court accepts his plea, he can plead guilty. We did have several hearings. On the last one, I told [defense counsel] that, first, that the Feds want the case, they called me, they're on their way. When they do that, I dismiss my case just to avoid duplicate prosecution.

. . .

. . . So this morning—I had a warrant that day at the end of the day Tuesday. So this morning, I came in, filed a motion to dismiss with the court, and earlier we asked—the Defendant asked for his attorney, his attorney is here, and again—once I dismiss this case, he cannot plead guilty, and I'm moving to dismiss it.

[DEFENSE COUNSEL]: I can't object to that. I wish I could, but I can't.

JA 89-90. The state court then dismissed McConer's case without prejudice.

On March 2, 2005, McConer was indicted in federal court for possession with intent to distribute cocaine base, possession with intent to distribute marijuana, felon in possession of a firearm, and possession of a firearm in furtherance of a drug-trafficking crime. In May, McConer filed a "Motion to Remand to State Court for Entry of Guilty Plea in Accordance with Original Plea Offer and Request for Evidentiary Hearing," arguing that his decision not to accept the state's plea offer was not knowing or intelligent because he was not adequately apprised of the federal penalties he faced, and that remand to state court was the appropriate remedy. McConer's motion erroneously indicated that he had been offered a plea bargain of two years. Government counsel advised defense counsel that the state prosecutor had not offered McConer a reduced plea, and defense counsel then filed a supplement to his motion to correct the mistake. In the supplemental motion, McConer also argued that his due process rights had been violated by the state's failure to allow him to plead guilty and that he was entitled to seek specific performance of the state's offer to let him plead guilty as charged.

The district court denied McConer's motion to remand in August 2005. The district judge first noted that

the biggest problem that I have here is what kind of jurisdiction do I have to send this back to the state court and tell them to do anything? I mean, we've got . . . dual sovereignty, the feds can proceed on this even if the state has proceeded on the same charges or on similar charges.

JA 303. The district judge ultimately denied the motion, explaining that

the problem that you have is that the federal charges were filed in this case on February 7, before Mr. McConer made any attempt to plead guilty, and as I recall [state defense counsel's] testimony, he had discussed this matter with Mr. McConer on many occasions before Mr. McConer decided finally sometime on, sometime after the 7th, I think it was the 11th, that he wanted to plead guilty.

. . .

So once the federal government took jurisdiction of this case, I don't think there's anything more to talk about. He hasn't accepted the offer before that or indicated any desire to accept the offer before that, and I think that is the end of the jurisdictional question, and for that reason, I'm going to deny the motion.

JA 310-11.

On May 13, 2005, McConer filed a motion to suppress the statements he had made to Officer Hughes both in the bedroom and in the kitchen. McConer argued that his statements during the bedroom talk were the result of custodial interrogation without *Miranda* warnings, and that they were not voluntary because Officer Hughes "pressured" him to "give him names" or else he would be held responsible for the gun. McConer also argued that any statements he made in the later kitchen interview were tainted by his unwarned, coerced bedroom statements, and that his kitchen statements were also the product of coercion. The district court denied his motion to suppress on July 1, 2005, finding that Officer Hughes's testimony regarding both exchanges was credible and that no interrogation had taken place without proper *Miranda* warnings.

With respect to the items police discovered in the bedroom dresser, McConer filed a motion in limine to exclude as unduly prejudicial or irrelevant evidence of: (1) the type of identification (prison) recovered from the dresser; (2) the return address and McConer's prisoner number on the envelopes McConer had mailed to his girlfriend from prison; (3) the contents of the letters recovered; and (4) the state criminal case notice papers. McConer moved separately to exclude as unduly prejudicial evidence of his prior convictions, which included three prior convictions for delivery of less than 50 grams of cocaine. The district judge agreed to exclude evidence of McConer's prior convictions as long as McConer agreed to stipulate to a prior felony conviction for purposes of his felon-in-possession charge, which he did. With respect to the items seized from the dresser drawer, the Government agreed to redact from the envelopes the prison return address and McConer's prisoner number, and stated that it would leave only McConer's name unredacted. The district judge stated that she would permit introduction of the traffic ticket addressed to McConer, and that she would permit testimony that another court-related document was found addressed to McConer but would not allow mention of what the court document was. The district judge also stated that she would permit testimony that a piece of identification was found, but, because it was a prison ID and therefore highly prejudicial, she would permit neither the introduction of the actual ID nor testimony regarding what type of ID it was.

When Officer Hughes testified later during the trial that McConer had told him that he had just gotten out of prison and could not be around guns or dope, defense counsel did not immediately object. Instead, defense counsel had Hughes reaffirm on cross-examination that McConer had asked how much time he could get and that he stated he could not be around guns. The next day, defense counsel objected to Hughes's testimony regarding McConer's prison statements and requested a mistrial, arguing that "as I understood it, the Court ruled that prison, that type of identification, that word was too prejudicial and should not be uttered in this case." McConer did not object to Hughes's testimony regarding his statement that he could not be around guns or drugs, and did not object to Hughes's general testimony that people who are on probation or parole often try to distance themselves from narcotics and weapons. McConer's attorney explained that he "chose not to object at that time" because he did not want to bring more attention to the testimony. The court denied McConer's request for a mistrial, explaining that

> first of all, you've stipulated that he has a prior felony conviction. . . . and although there was a motion in limine which I granted with respect to striking the references to the prison ID and the prison return address and documentary evidence that would establish it, and I guess on balance I would have preferred that we didn't have any testimony that indicated the defendant's statement that he had a prior conviction. The fact is the jury knows that he is a convicted felon because he stipulated to it, so I don't see that there's any prejudice here . . . .

JA 688.

During closing argument, the prosecutor attempted to cast doubt on the defense theory that McConer was merely present when the raid took place and not otherwise connected to the residence.

The prosecutor reminded the jury that McConer could not be around guns or drugs because of his stipulated prior felony and asked the jury to consider why McConer was seen running from the bedroom and why his personal items were found there if he was just "merely present." In so arguing, the prosecutor made the following statement:

> Ladies and gentlemen, the defendants have offered you a defense in this case as included in the jury instructions of mere presence. It doesn't work. This defense does not work, it's not supported by the evidence. The stipulations, he has a prior felony, he can't be around drugs and guns, so why is he there? Why is he there? He's got a prior drug conviction. He can't—prior felony conviction, I'm sorry. He can't be around drugs . . ."

JA 929. Defense counsel objected to the prosecutor's reference to McConer's "drug" conviction during a side-bar conference and requested a mistrial, which the district court denied. At the conclusion of closing arguments, defense counsel reiterated his objection and re-requested a mistrial. He did not object to the prosecutor's reference to McConer's inability to be around drugs or guns. The court again denied his request, concluding that the prosecutor's slip was not prejudicial enough to require a mistrial:

> It was clearly just a slip of the tongue. [The prosecutor] caught herself immediately, and again, this—we have a stipulation with respect to the prior felony, they know that he's a prior convicted felon. The fact that it slipped and she called it a drug conviction, I just don't think was prejudicial to rise to the level where it would require a mistrial. Motion denied.

JA 965.

The jury convicted McConer on all counts. Based on a criminal history category of VI and an offense level of 37, McConer's Guidelines sentencing range was calculated at 360 months to life imprisonment. McConer sought a 15-year downward departure because: (1) his offense level reflected a gross over-representation of his criminal history; (2) his Guidelines range resulted in unwarranted disparities between him and his co-defendants; (3) his Guidelines range represented an unwarranted disparity between him and other defendants convicted of powder cocaine offenses; and (4) his Guidelines range was disproportionate in his case considering that he had been charged in and had attempted to plead guilty in state court, but was refused the opportunity because the federal prosecution had begun.

In sentencing McConer, the district judge explicitly applied a presumption of reasonableness to the Guidelines:

> Well, this is difficult for one reason only, as far as I'm concerned, and that is that no matter how you look at it, 30 years is just a ton of time. And if I were the original decision maker, I probably wouldn't have come up with 30 years as the appropriate sentence in this case.
>
> And I recognize that I have discretion under *Booker* to fashion a reasonable sentence, but the Sixth Circuit has given us guidelines which require that I start with the presumption that the guideline sentence is reasonable, look for possible areas of departure, and also look at 3553(a) and see if there is any basis for adjusting the sentence because of that.

JA 988-89. Based on the sentencing disparity between McConer and his co-defendants in state court, however, the judge varied downward from the Guidelines range, granting him a 1-level

criminal history reduction. Otherwise, the court rejected McConer's sentencing arguments and sentenced him to a total of 27 years' imprisonment.

On appeal, McConer argues that his constitutional rights were violated when the state ignored his attempts to plead guilty, and that the district court should have remedied this by dismissing the federal indictment or by enforcing his state plea agreement with specific performance. McConer also argues that his right against self-incrimination was violated when the Government introduced statements obtained in violation of *Miranda*, and that the error was not harmless. He argues that his bedroom talk with Officer Hughes constituted custodial interrogation without *Miranda* warnings, and that the *Miranda* warnings for the kitchen talk—10 to 15 minutes after the bedroom talk—were ineffective under *Missouri v. Seibert*, 542 U.S. 600, 615 (2004), because they were given "midstream" in "successive interrogation, close in time and similar in content." McConer also argues that his due process right to a fair trial was violated when, in violation of the court's exclusion order: (1) the prosecutor argued in closing that McConer had a prior "drug" conviction; and (2) Officer Hughes testified that McConer had served a prior stint in prison and that it was common for individuals on parole or probation to try to distance themselves from narcotics and weapons. Finally, McConer argues that his sentence is procedurally unreasonable because the district judge applied a presumption of reasonableness to the Guidelines, and substantively unreasonable because she did not address some of his arguments for a downward departure.

## II. The district court properly concluded that it could not remand McConer's case to state court and properly refused to dismiss the federal indictment.

The district court properly concluded that it could not remand McConer's case to state court. As we stated clearly in *Morris*, 470 F.3d at 599-600, a federal district court lacks jurisdiction to "remand" a criminal case to state court to remedy constitutional errors.

The district court also properly refused to dismiss the federal indictment. Most importantly, the district court had no reason to provide such a remedy because McConer suffered no wrongs. Contrary to McConer's allegations, the state neither breached a plea agreement nor refused to let him plead guilty. He was told that he could avoid having his case referred to the federal government by pleading guilty "as charged." He opted not to. He was then told that this offer would no longer be good if the federal government did choose to prosecute him, and that his case would, in fact, be referred to the federal government. He still chose not to enter a plea. He was represented by effective counsel during this entire exchange. The federal government then came after him, at which point the state's offer not to refer his case became inoperative and useless, as he was warned that it would. Thus there was no agreement, and his argument that the "district court has authority to enforce a state plea agreement with specific performance" is a nonstarter under these circumstances. Simply put, there was no wrong for the district court to remedy.

Even if the state's handling of McConer's plea negotiations could be considered a violation of McConer's rights, dismissal of the federal indictment would not be an appropriate remedy in this case because the federal government was not involved in any supposed violation. McConer is not aided by this court's holding in *Morris*. In *Morris*, the defendant did not accept a plea offer in state court in large part because his attorney, who was inexperienced in federal practice, had been misinformed by the Assistant United States Attorney through the state prosecutor that the defendant would face a Guidelines range of 62 to 68 months in federal court, when in fact he would have faced a range of 90 to 97 months if he pled guilty and 101 to 111 months if he did not. *Id*. at 598-99. The state attorney had also just received the defendant's case, had not received complete discovery, and had inadequate opportunity to consult with her client during plea negotiations. *Id*. at 599. The court held that under these circumstances, dismissal of the federal indictment was an appropriate remedy:

Because the United States Attorney's Office made itself a party to the state court plea offer, the district court was justified in enforcing the plea offer against it based on traditional principles of contract law. Although there is no basis for the purported remand to state court and the related reinstatement of the state plea offer, dismissal of the federal indictment was within the district court's authority to put Morris back in the position he would have been in but for the denial of his right to counsel in light of the federal prosecutor's entanglement with the state plea process.

*Id*. at 600-01. In McConer's case, by contrast, the federal government had no involvement in his state plea negotiations, and there were no other problems with his representation. Accordingly, McConer's reliance on *Morris* is misplaced, and the district court properly refused to dismiss his federal indictment.

## III. Reversal is not warranted on McConer's *Miranda* arguments.

### A. The admission of McConer's bedroom statements regarding prison, guns, and drugs did not violate *Miranda*, and any potential error in the admission of his statement regarding his living situation was harmless.

The admission of McConer's unwarned statements that he had "just gotten out of prison" and that he "couldn't be around . . . the guns and the dope" did not violate *Miranda* because these statements were not obtained through interrogation. As the Supreme Court explained in *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Officer Hughes testified that McConer asked to speak with him privately, at which point Hughes took him into the bedroom. McConer then volunteered that he had just gotten out of prison and that he could not be around guns or dope. The district court chose to credit Hughes's testimony and found that McConer had volunteered these statements, and it did not clearly err in doing so. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (explaining that in reviewing the denial of a suppression motion, the court reviews factual findings for clear error).

Only one portion of the bedroom conversation could conceivably be construed as "interrogation," and that is if Officer Hughes did, in fact, ask McConer whether he lived at the residence. Hughes testified regarding the bedroom talk that "I didn't really ask him anything other than the fact did he ever live there, you know, where is he living at." JA 252. At another point, Hughes testified that McConer "just wanted to tell me that he didn't know what was going on. And I asked him if he lived there. He said he used to." JA 255; *see also* JA 555 ("I just asked him where he lived, and I think he said I don't live here anymore, or something to that effect . . . ."). Because this question was reasonably likely to elicit incriminating information, *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), it could be construed as interrogation.

Nevertheless, it is not entirely clear from Hughes's testimony whether McConer provided the information about his living situation in response to a question, or whether he initially volunteered it along with his other volunteered statements and Hughes simply asked a follow-up question to confirm. Hughes later testified that

when [McConer] came in there and when all the narcotics and the weapon came out of there, even though—and the paperwork. He had paperwork that was brought in there stating that he lived there. He just told me "I just got out of prison, I don't even live here anymore," something like that.

JA 267. It is therefore possible that McConer initially volunteered the information about his living situation, in which case it was not obtained through interrogation in violation of *Miranda*. And,

because of this ambiguity in Hughes's testimony, the district court's conclusion that no interrogation took place could be considered partly a factual determination, in addition to a legal one, in which case it would receive some deference from this court. The district court concluded that McConer initiated the conversation with the intent to explain "look, this isn't my place; I haven't lived here for awhile; and I can't be around drugs and guns." JA 293-94.

Even assuming both that Hughes asked the question and that it constituted interrogation, any error in its admission was harmless beyond a reasonable doubt. *See United States v. Soto*, 953 F.2d 263, 265 (6th Cir. 1992). Presumably, the theory under which this statement is harmful is that McConer's admission that he used to live at the residence establishes a connection and undercuts his defense that he just happened to be present in the lower level when the police arrived. But the evidence connecting McConer to the residence was so overwhelming that any slight prejudice resulting from his admission that he used to live there would be utterly trivial. For example, documents bearing McConer's name were found in the dresser drawer; his coat was hanging on the bedroom door; and he had keys to the front door and grate. Contrary to McConer's arguments on appeal, the statements he made during the bedroom talk were not admitted as character, "other crimes," or "bad acts" evidence.

### B. The admission of McConer's kitchen statements did not violate *Miranda*.

Assuming that Officer Hughes's bedroom question about McConer's living situation was not interrogation, there is no *Miranda* problem with the admission of the statements McConer made to Hughes during their kitchen interview. Officer Hughes read McConer his constitutional rights twice before questioning him in the kitchen and obtained a waiver.

Even assuming Hughes's bedroom question did constitute interrogation, however, the kitchen interrogation was still proper under *Miranda* because the circumstances surrounding McConer's conversations with Officer Hughes do not resemble those that the Supreme Court found problematic in *Seibert*, 542 U.S. at 613-14 (plurality opinion), 620-21 (Kennedy, J., concurring), in which the Court dealt with *Miranda* warnings inserted midstream during interrogation.

In *Seibert*, the police officers who obtained a confession from the defendant had been specifically trained not to give *Miranda* warnings initially during interrogation, but rather to wait until after interrogation had produced a confession or other incriminating evidence. *Id* at 609-10. As the *Seibert* plurality explained, this interrogation scheme had become popular among police departments because

> the sensible underlying assumption is that with one confession in hand before the [*Miranda*] warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail.

*Id*. at 613. The *Seibert* plurality therefore held that the "question-first" tactic violated *Miranda* because *Miranda* warnings "inserted in the midst of coordinated and continuing interrogation" are ineffective to advise the defendant of his rights and the consequences of waiver. *Id*. at 613-14.

The circumstances surrounding McConer's conversations with Officer Hughes bear almost no resemblance to what occurred in *Seibert*, and indeed more closely resemble the case that the *Seibert* plurality distinguished: *Oregon v. Elstad*, 470 U.S. 298 (1985). In *Elstad*, police went to a suspect's house to take him into custody on a burglary charge. *Id.* at 315. After arriving at the house, one of the officers stopped to speak with the suspect's mother, while the other officer joined the suspect in a "brief stop in the living room." *Id.* Without giving the suspect *Miranda* warnings, the officer stated that he "felt" the suspect had been involved in the burglary, at which point the suspect acknowledged that he had been at the scene. *Id.* at 301. Later, at the police station, the suspect was given *Miranda* warnings, after which he was thoroughly interrogated and made a full confession. *Id.* The Court rejected Elstad's "cat out of the bag" theory that, because of his initial unwarned admission in the living room, the *Miranda* warnings preceding his interrogation at the police station were ineffective. *Id.* at 311-14. In distinguishing *Elstad*, the *Seibert* plurality explained that the *Elstad* Court "took care to mention that the officer's initial failure to warn was an 'oversight,'" 542 U.S. at 614, and that "on the facts of that case, the Court thought any causal connection between the first and second responses to the police was 'speculative and attenuated,'" *id.* at 615 (citing *Elstad*, 470 U.S. at 313).

Assuming that McConer's unwarned bedroom statement that he no longer lived at the residence was the result of "interrogation" by Officer Hughes, the *Miranda* warnings he received in the kitchen would still be effective under the plurality's analysis in *Seibert*. While under the plurality analysis a police officer's stated intent would not be determinative, *see Seibert*, 542 U.S. at 616 n.6, none of the facts of McConer's case indicates a "police strategy adapted to undermine the *Miranda* warnings" or indicates in any way that a reasonable person in McConer's position would not have understood his constitutional rights, *id.* at 616-17 & n.6. McConer is the one who asked to speak with Officer Hughes and volunteered information, at which point Hughes asked him what was, at most, a casual background question about whether or not he lived there, and promptly ended the conversation. By contrast, in *Seibert*, as explained by the plurality:

> The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment.

*Id.* at 616.

To be sure, there are aspects of McConer's case that make the kitchen conversation regarding his living situation look somewhat like a continuation of the bedroom exchange; for example, the facts that: (1) Hughes told McConer in the bedroom that they would "get this down on paper later"; (2) the formal kitchen question about McConer's living situation ("How long did you live at this location?") was phrased in a way that indicated to McConer that Hughes already knew that McConer had lived there; and (3) Hughes never advised McConer in the kitchen that his prior statement about his living situation would not be used against him. Nonetheless, the factor primarily relied upon by the *Seibert* plurality is simply absent here, which was that "a reasonable person in [Seibert's] shoes would not have understood [the midstream *Miranda* warnings] to convey a message that she retained a choice about continuing to talk." *Id.* at 617. Indeed, to the extent that Officer Hughes's bedroom question about McConer's living situation constituted interrogation at all, it is more properly regarded as a "good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." *Id.* at 615 (distinguishing *Elstad*). The admission of McConer's kitchen statements thus did not violate *Miranda* under the *Seibert* plurality's analysis.

Under Justice Kennedy's narrower concurrence, which provided the fifth vote to find a *Miranda* violation in *Seibert*, a two-step strategy must be "deliberate" in order to violate *Miranda*. *Id*. at 622 (Kennedy, J., concurring). No such deliberate strategy has been shown in this case. Thus neither the plurality nor the concurrence in *Seibert* supports McConer's *Miranda* argument.

## IV. The admission of the statements referring to McConer's prison background does not warrant reversal.

Neither the challenged portions of Officer Hughes's testimony referring to McConer's prison background nor the prosecutor's closing remarks warrant reversal. McConer takes issue with three portions of Officer Hughes's testimony: (1) that McConer had told him that he had "just gotten out of prison"; (2) that McConer had told him that he "could not be around guns or dope"; and (3) that it's "very common when you're in a house, people will try to distance themselves from the guilty, from the narcotics, from the weapons, especially if they're on probation or parole, they cannot get caught at around or in the residence of either guns or narcotics." McConer also argues that the prosecutor's reference to his prior "drug" conviction during closing arguments warrants reversal.

### A. Testimony that McConer had "just gotten out of prison"

Officer Hughes's testimony that McConer told him that he had "just gotten out of prison" does not warrant reversal. First, it is debatable whether the admission of this statement even violated any of the court's orders of exclusion, in which case its admission is not problematic. The court's exclusion of prior-conviction evidence simply meant that, because the parties stipulated to the "felon" element of "felon in possession," the probative value of additional evidence regarding McConer's prior convictions was outweighed by the danger of unfair prejudice that would result from the jury's learning details of his past convictions. Admitting testimony that McConer told Officer Hughes that he had "just gotten out of prison" for the purpose of explaining why McConer was seen fleeing from the bedroom, thus indicating more than "mere [ignorant] presence," is not the same as admitting, for example, evidence of his 1996 conviction for delivery of cocaine just for the sake of proving that he had a conviction. For this reason, it is doubtful that this portion of Hughes's testimony fell under the court's prior-conviction exclusion.

Moreover, the court's other exclusion of evidence for being unfairly prejudicial was arguably on a very specific level and would not operate to exclude McConer's statement to Hughes that he had just gotten out of prison. Contrary to the picture McConer paints on appeal, he did not make a blanket request for the exclusion of all references to his prior imprisonment. Rather, he requested the exclusion of very specific aspects of items seized from the bedroom dresser as being either unfairly prejudicial or irrelevant. The district court agreed, and excluded those particular things—for example, the prison addresses on letters to McConer's girlfriend and the fact that the identification card found in the drawer was prison identification. It is likely, then, that McConer's statement to Hughes about getting out of prison is not something that would have been included in the district court's exclusion of specific prejudicial and/or irrelevant materials. Indeed, the district court later indicated that, although it would have preferred no mention of prison at all, perhaps only specific things, and not any general mention of prison, had been excluded:

> [F]irst of all, you've stipulated that he has a prior felony conviction. . . . and although there was a motion in limine which I granted with respect to striking the references to the prison ID and the prison return address and documentary evidence that would establish it, and I guess on balance I would have preferred that we didn't have any testimony that indicated the defendant's statement that he had a prior conviction. The fact is the jury knows that he is a convicted felon because he stipulated to it, so I don't see that there's any prejudice here . . . .

JA 688.

This interpretation of the exclusion order is bolstered by the fact that the probative value of McConer's statements to Hughes is higher than that of the information that was redacted from the dresser materials. The probative value of the dresser documents and envelopes was that they connected McConer to the apartment. The fact that the envelopes and ID were from prison, however, was not at all probative of McConer's connection to the apartment, and was instead prejudicial. In contrast, McConer's statements to Hughes about having been in prison and not being allowed around guns and dope are more probative because they demonstrate defensiveness on McConer's part and a reason why he was seen fleeing from the bedroom. Thus, the district court likely would have conducted a different balancing analysis with respect to McConer's prison statements to Hughes, and it is arguably incorrect to assume that this statement would be included in the court's exclusion of specific items merely because it referred to "prison."

Even if the admission of McConer's statement that he had just gotten out of prison were characterized as violating a general court exclusion of all evidence relating to "prison" and therefore improper, the district court did not abuse its discretion in denying McConer's motion for a mistrial, *United States v. Talley*, 194 F.3d 758, 764 (6th Cir. 1999), and the statement's admission would not otherwise require reversal for prosecutorial misconduct under *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), because it was not flagrant, *see United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). In determining whether misconduct is flagrant and thus warrants reversal, this court considers four factors:

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Id.* (citing *Carroll*, 26 F.3d at 1385). As the district court explained, it is doubtful that McConer's reference to prison prejudiced him in the way that he thinks he was prejudiced. The jury already knew that he had been convicted of a felony, for example, and a defense witness also mentioned that he had been in "prison." The evidence against McConer was otherwise strong, and it is highly unlikely that the prosecutor's improper introduction of Hughes's testimony—assuming it was improper—"made the difference between conviction and acquittal." *See Carroll*, 26 F.3d at 1390. Nor can it be said that the prosecution was deliberately attempting to sneak in prohibited evidence, given the lack of clarity regarding how specific or general the court's exclusion of prison references was. Finally, testimony regarding McConer's statement that he had "just gotten out of prison" and could not be around guns or dope was "invited by defense counsel's argument," *see Carter*, 236 F.3d at 783, in that McConer's statement, combined with the fact that he was seen fleeing from the narcotics, rebutted McConer's argument that he was merely and ignorantly present at a drug-infested location. Consequently, the admission of McConer's prison statements through Officer Hughes was not reversible error, assuming it was error at all.

### B. Parole testimony and testimony that McConer "could not be around guns or dope"

Officer Hughes's testimony that McConer told him that he "could not be around guns or dope" and that individuals on parole or probation tend to distance themselves from narcotics also does not warrant reversal. The admission of this testimony is reviewable only for plain error because McConer did not object to the introduction of these statements at any point in the district court. *Carroll*, 26 F.3d at 1383. "The plain error doctrine mandates reversal only in exceptional circumstances and only where the error is so plain that the trial judge and prosecutor were derelict in countenancing it." *Id.* (internal quotations omitted) (quoting *United States v. Slone*, 833 F.2d 595, 598 (6th Cir. 1987)).

Admission of these statements was not error at all, let alone plain error.  As explained above, the fact that McConer could not be around guns or drugs did not fall within the scope of the district court's exclusion of specific pieces of evidence as unfairly prejudicial, so that the admission of this statement was simply not improper.  Nor did it by its terms violate the district court's general exclusion of prior-conviction evidence.  Contrary to McConer's insinuations on appeal, at no point did Officer Hughes tell the jury that McConer was on parole or probation.  Because the admission of this testimony was not improper, it does not warrant reversal.

### C. Reference to McConer's prior "drug" conviction during closing argument

The prosecutor's reference to McConer's prior "drug" conviction in the closing argument also does not warrant reversal.  Although the statement was improper because the district court had prohibited reference to the nature of McConer's prior convictions, the misconduct was not flagrant. *See Carter*, 236 F.3d at 783.  As the district court explained, the prosecutor's remark was an isolated incident and an accidental "slip of the tongue." *See id.*  Moreover, the district court did not abuse its discretion in determining that the prejudice to McConer was minimal, *see Talley*, 194 F.3d at 764, and the evidence against McConer was otherwise strong, *see Carter*, 236 F.3d at 783. Consequently, although the prosecutor's remark was improper, it does not warrant reversal.

## V. McConer's sentence

Finally, however, we must vacate McConer's sentence because the district court misstated its mandate and explicitly applied a presumption of reasonableness to McConer's Guidelines range:

> Well, this is difficult for one reason only, as far as I'm concerned, and that is that no matter how you look at it, 30 years is just a ton of time.  And if I were the original decision maker, I probably wouldn't have come up with 30 years as the appropriate sentence in this case.
>
> And I recognize that I have discretion under *Booker* to fashion a reasonable sentence, but the Sixth Circuit has given us guidelines *which require that I start with the presumption that the guideline sentence is reasonable*, look for possible areas of departure, and also look at 3553(a) and see if there is any basis for adjusting the sentence because of that.

JA 988-89 (emphasis added).  As the Supreme Court explained in *Rita v. United States*, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." 127 S. Ct. 2456, 2465 (2007); *see also United States v. Wilms*, 495 F.3d 277, 281-82 (6th Cir. 2007).  Rather, the district court's duty is to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553(a)(2), and "appellate 'reasonableness' review merely asks whether the trial court abused its discretion." *Rita*, 127 S. Ct. at 2465.  Indeed, the rationale for permitting a presumption of reasonableness on appellate review is that, "by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case," *Rita*, 127 S. Ct. at 2463, and "where judge and Commission *both* determine that the Guidelines sentence is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," *id.* at 2467; *see also Wilms*, 495 F.3d at 282.

Here, the district court stated that it "probably wouldn't have come up with 30 years" had the court been the original decision-maker; explicitly stated that a presumption of reasonableness applied to McConer's Guidelines sentence; and characterized the court's mandate as "to fashion a reasonable sentence."    McConer's case must therefore be remanded for resentencing,

notwithstanding that, as in *Wilms*, 495 F.3d at 282 n.1, the district court may simply have misspoken.

McConer's other arguments for unreasonableness fail. On remand, the district court may reconsider whether it should adjust McConer's sentence based on the consideration that his co-participants in state court would receive lesser sentences. *See United States v. Malone*, 503 F.3d 481, 486 (6th Cir. 2007) (holding "that it is impermissible for a district court to consider the defendant's likely state court sentence as a factor in determining his federal sentence").

## VI. Conclusion

We affirm McConer's conviction but vacate McConer's sentence and remand for resentencing.