RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSHUA L. WOOLRIDGE,

*Defendant-Appellant*.

No. 22-3243

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:21-cr-00145-1—John R. Adams, District Judge.

Decided and Filed:  April 6, 2023

Before:  SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  Stephanie F. Kessler, PINALES STACHLER YOUNG & BURRELL CO., L.P.A., Cincinnati, Ohio, for Appellant.  Damoun Delaviz, UNITED STATES ATTORNEY'S OFFICE, Akron, Ohio, for Appellee.

─────────────────

**OPINION**

─────────────────

SUTTON, Chief Judge.  After police detained Joshua Woolridge but before they read him the required *Miranda* warnings, Woolridge told the officers that he was out on parole and that he had carried a gun.  Woolridge said the same after the officers gave him the *Miranda* warnings minutes later.  The district court refused to suppress Woolridge's post-warning

statements and imposed a sentence above the Sentencing Guidelines range. Finding no reversible error, we affirm.

I.

After visiting a convenience store just before midnight, Joshua Woolridge walked through an Akron neighborhood toward his girlfriend's apartment. As it happens, police officers were searching for a fugitive in the area. When Woolridge cut across a vacant lot, Officer Brandon Collins approached him and asked for his name. Woolridge turned and ran. As he sprinted, Woolridge tossed several items. Within a few hundred yards, two officers caught Woolridge.

Woolridge began talking immediately. As Officer Collins searched him, Woolridge said, "I got a warrant" out for me. R.19 at 2. Moments later, he added "I got a parole violation, sir." *Id.* Collins moved Woolridge to a containment van and took his biographical information. All the while, Woolridge tried to speak with Collins: "Let me tell you something, sir." Gov't Exhibit 1 at 3:32–35. "Can I talk to you, sir?" *Id.* at 3:40–45. "Sir, let me talk to you for one second." *Id.* at 4:00–03. "Listen, sir, I got to tell you something else." *Id.* at 4:40–45. Collins brushed him off each time: "Not right now, man." *Id.* at 3:43–44. "Just hang tight, okay?" *Id.* at 7:15–20.

After a few minutes, Collins asked Woolridge about the items he threw during the chase: "Nothing illegal then, right?" *Id.* at 6:20–30. Woolridge said no. As Collins turned away, Woolridge called him back. "Sir? So, we'll keep it 100, sir. Let me tell you." *Id.* at 6:30–35. Woolridge explained that his brother had been murdered, and that Woolridge had been trying to stay out of the way. "I understand that," Collins said. *Id.* at 6:50–53. Woolridge added "I had a firearm on me, sir." *Id.* at 6:53–55. "Where's it at now?" Collins asked. *Id.* During the next few minutes, officers searched for the gun. They spotted it only after asking Woolridge to specify where he threw the gun.

With the gun secured, Woolridge remained talkative. "Can I just talk to you though?" he asked Collins several times. *Id.* at 15:55–16:00; *id.* at 16:20–35. Eventually, Collins promised that they would talk soon. "But listen," Woolridge insisted, "'cus I'm telling you the reason I

had the gun and everything." *Id.* at 16:10–33. "I understand that," Collins responded. *Id.* "Now that we have [the gun], . . . I'll talk to you. I promise." *Id.* at 16:30–40.

Collins returned a few minutes later. As he began to read the *Miranda* warnings, Woolridge interrupted, saying "I know my rights, sir." *Id.* at 21:20–23. Collins explained that he needed to give the warnings anyway and proceeded to give them. At the end, Collins added "and you can decide at any time to exercise these rights and not answer the questions." *Id.* at 21:38–42. "Okay," Woolridge acknowledged. *Id.* at 21:41–43.

Collins returned to the subject that Woolridge raised earlier: "Do you want to tell me what happened and why you were carrying a gun?" *Id.* at 21:43–46. Woolridge did not hesitate. He again explained that he had carried the gun due to his brother's murder. "I had a firearm on me," he added, "but I had no intent to try to hurt nobody." *Id.* at 22:00–30.

A grand jury charged Woolridge with being a felon in possession of a firearm. 18 U.S.C. § 922(g). Woolridge moved to suppress the statements he made to Collins before receiving the *Miranda* warnings. He did not argue that the post-warning statements violated *Miranda*. After a hearing, the district court suppressed the unwarned statements and permitted the admission of the post-*Miranda* statements.

Woolridge pleaded guilty, reserving the right to appeal the rejected suppression motion and any sentence outside his Guidelines range. At sentencing, the court varied upward by 13 months, imposing a 46-month sentence. Woolridge appeals.

## II.

*Suppression challenge.* Woolridge claims that we must vacate his conviction because the district court should have suppressed the statements he made after he received *Miranda* warnings. We review the district court's fact finding for clear error and its legal decisions afresh. *United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021).

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." To protect this right, *Miranda* requires police officers to warn suspects taken into custody of the right to remain silent and the risk of speaking without a lawyer

present, along with other warnings. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). Generally speaking, courts honor the *Miranda* rule by suppressing unwarned statements and by admitting warned statements, the latter because the warnings enable a suspect "to exercise his own volition in deciding whether" to speak again. *Oregon v. Elstad*, 470 U.S. 298, 308 (1985).

But the warnings do not always suffice to admit post-*Miranda* statements. If police officers coerce a suspect in custody or "undermine the suspect's ability to" stay silent, courts will refuse to admit even post-*Miranda* statements. *Id.* at 309. One fact pattern that has caught judges' attention in this area arises when the police withhold warnings until a suspect confesses, administer *Miranda*, then pressure the suspect to repeat the confession. *Missouri v. Seibert*, 542 U.S. 600, 612–13 (2004) (plurality); *United States v. Ray* (*Ray I*), 803 F.3d 244, 272 (6th Cir. 2015) (adopting the *Seibert* plurality).

Even in such cases, post-warning statements remain admissible if the *Miranda* warnings nevertheless functioned effectively—if the warnings informed the suspect that he had a genuine choice to continue speaking. *Seibert*, 542 U.S. at 611–12 & n.4. Absent an interrogation of this sort or another coercive tactic, the admissibility of a post-warning statement turns "solely" on whether the suspect spoke "knowingly and voluntarily." *Elstad*, 470 U.S. at 309.

The district court correctly admitted Woolridge's post-*Miranda* statements. Woolridge spoke voluntarily after receiving *Miranda* warnings. No coercion or coercive interrogation tactic compromised the voluntariness of his statements or impaired the effectiveness of the warnings.

Woolridge talked voluntarily. He eagerly spoke to the officers at every opportunity, "unquestionably" seeking "to volunteer information." R.19 at 5. He also "freely acknowledged" his parole status and pressed for a chance to explain why he was carrying a gun that night. *Bobby v. Dixon*, 565 U.S. 23, 29, 31 (2011) (per curiam); *see Elstad*, 470 U.S. at 301, 315. That holds true both before and after the *Miranda* warnings.

For their part, the officers showed little interest in getting Woolridge to talk. They did not compel Woolridge to speak through abuse, threats, or incentives. *Dixon*, 565 U.S. at 29–30; *Elstad*, 470 U.S. at 302, 315. Nor did they employ improper tactics to secure a confession. They did not initiate the conversations, and in fact they hardly spoke to him at all, repeatedly resisting

*his* efforts to talk. Officer Collins refused to talk to Woolridge numerous times. And Woolridge's own insistence led Collins to speak with Woolridge after the officers found the gun: "Can I just talk to you for a minute?" Gov't Exhibit 1 at 16:20–25. Before doing so, Collins read the *Miranda* warnings. And Woolridge "cho[se] to speak after being informed of his rights," a reality that proves "highly probative" of voluntariness. *Elstad*, 470 U.S. at 318.

This case does not present the coercive qualities that undermined the *Miranda* warnings in *Seibert*. Police officers subjected Patrice Seibert to "systematic, exhaustive" questioning. *Seibert*, 542 U.S. at 616. Seibert confessed a half hour later. *Id.* at 605. Only after they had a confession in hand did the officers administer *Miranda* warnings. Then they pressed Seibert to confess again by recounting her earlier confession. *Id.* at 616–17. The Court found that this strategy undermined *Miranda*. *Id.* at 613, 616.

Today's facts do not "remotely resemble the police protocol invalidated in *Seibert*." *Hoffner v. Bradshaw*, 622 F.3d 487, 512 (6th Cir. 2010); *see Dixon*, 565 U.S. at 31 (distinguishing *Seibert*); *United States v. McConer*, 530 F.3d 484, 497 (6th Cir. 2008) (same). Officer Collins did not employ systematic, exhaustive, or coordinated questioning. And he never pushed for a confession or exploited Woolridge's unwarned statements. *Cf. Elstad*, 470 U.S. at 316.

But even if this had not been the case, even in other words if the police officers had used improper tactics, the post-warning statements would be admissible because the *Miranda* warnings "effectively" conveyed that Woolridge "could choose to stop talking." *Seibert*, 542 U.S. at 612. When Collins read the *Miranda* warnings, he explained that Woolridge had the "right to remain silent" and that he could "decide at any time to exercise these rights and not answer the questions." Gov't Exhibit 1 at 21:25–42. Collins' question bolstered those warnings, asking "Do you want to tell me what happened and why you were carrying a gun?" *Id.* at 21:43–46. Woolridge grasped the message. After hearing his rights, Woolridge acknowledged that he understood them. *Id.* at 21:41–43. Even before Collins finished the warnings, Woolridge interrupted to assert "I know my rights." *Id.* at 21:20–25. By every indication, Woolridge knew he had a choice, and he decided to speak anyway.

Other clues confirm the point. Officer Collins did not treat the pre- and post-*Miranda* periods as a single interrogation. Nor did Collins "exploit" Woolridge's unwarned admission to pressure him into speaking a second time. *Elstad*, 470 U.S. at 316. Collins instead "began [his] questioning anew." R.19 at 6. Fifteen minutes separated Woolridge's post-*Miranda* statements from his first admission that he carried a gun that night. That gap sufficed for Woolridge to refuse to repeat himself. *Cf. McConer*, 530 F.3d at 493. The discovery of the gun also differentiated the pre- and post-*Miranda* periods. That "change in circumstances" shifted the questioning from the gun's location to the consequences of possession, *Dixon*, 565 U.S. at 32—a shift that facilitated effective warnings, *see Seibert*, 542 U.S. at 618 (Breyer, J., concurring).

Woolridge disputes this conclusion. He claims that the *Seibert* plurality's test turns exclusively on five factors: (1) the completeness of the initial questions; (2) the overlap between the pre- and post-warning statements; (3) "the timing and setting"; (4) "the continuity of police personnel"; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615 (plurality). But we do not read the inquiry that rigidly. The *Seibert* plurality did not "condemn[] us to a mechanical counting of items on a list." *United States v. Heron*, 564 F.3d 879, 887 (7th Cir. 2009). The Supreme Court's decision in *Dixon* did not do so either. *See Dixon*, 565 U.S. at 31–33. And *Elstad* "direct[ed] courts to avoid" "a rigid rule" and to instead "examine the surrounding circumstances and the entire course of police conduct." *Elstad*, 470 U.S. at 318. In *Ray I*, to be sure, we adopted the "*Seibert* plurality's multi-factor test" and listed some considerations that the plurality employed. *Ray I*, 803 F.3d at 272–73. But we also said that the analysis "hinges on" an encompassing question: Did the *Miranda* warning give the suspect "a genuine choice whether to follow up on [his] earlier admission"? *Id.* (quoting *Seibert*, 542 U.S. at 616). On this record, the answer is yes.

A blinkered focus on *Ray I*'s factors would do little for Woolridge's cause anyway. Some factors partially weigh in Woolridge's favor: the officer and the setting stayed roughly the same, and some of the content of the statements overlapped. But others clearly do not. Fifteen minutes separated Woolridge's initial statements from his post-*Miranda* admissions. *McConer*, 530 F.3d at 493 (ten-to-fifteen-minute gap). And Officer Collins asked few questions and did not treat the sessions as continuous. With only a few signals partially favoring Woolridge, the

district court did not err. *See Heron*, 564 F.3d at 886–87 (finding no error in admitting statements because one factor favored that outcome).

Woolridge persists that two cases dictate the outcome today, *United States v. Ashmore*, 609 F. App'x 306 (6th Cir. 2015), and *United States v. Ray* (*Ray II*), 690 F. App'x 366 (6th Cir. 2017). Not true. For one, these unpublished cases do not bind. For another, they treat *Seibert* as if it created a rigid test for midstream-*Miranda* cases, thus misreading *Seibert*, *Elstad*, and *Dixon*. For still another, these cases do not match this one. *Ashmore* involved coercive tactics absent here, *Ashmore*, 609 F. App'x at 318–19, and *Ray II* involved a far more formal, detailed interrogation, *Ray II*, 690 F. App'x at 368–69, 372–73. In neither case, notably, did the suspect try over and over to speak to the officers as Woolridge did.

Woolridge also claims that the district court erred in finding that Officer Collins treated the pre- and post-*Miranda* periods as distinct. But Woolridge points to no evidence showing that the court erred in concluding that Collins began his questioning "anew." R.19 at 6.

One last point. Although no opinion commanded a majority in *Seibert*, our circuit adopted the plurality opinion's objective approach to midstream *Miranda* warnings, which does not consider the intent of the officer's conduct. *Ray I*, 803 F.3d at 272. In that conclusion, we are alone. Eight circuits hold that Justice Kennedy's concurrence controls, which also asks whether police deliberately undermined *Miranda*. *See United States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010); *United States v. Naranjo*, 426 F.3d 221, 231–32 (3d Cir. 2005); *United States v. Khweis*, 971 F.3d 453, 461 (4th Cir. 2020); *United States v. Fernandez*, 48 F.4th 405, 410 & n.1 (5th Cir. 2022); *United States v. Magallon*, 984 F.3d 1263, 1283 (8th Cir. 2021); *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006); *United States v. Guillen*, 995 F.3d 1095, 1116 (10th Cir. 2021); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006). Two more have not decided. *See United States v. Faust*, 853 F.3d 39, 48 n.6 (1st Cir. 2017); *United States v. Straker*, 800 F.3d 570, 617 (D.C. Cir. 2015). And one has an intra-circuit split. *See United States v. Hernandez*, 751 F.3d 538, 539–40 (7th Cir. 2014); *Heron*, 564 F.3d at 884–86. On another day, we should ask whether we must keep our side of this circuit split open.

III.

*Sentencing challenge.* Woolridge separately challenges the substantive reasonableness of his sentence, arguing that the court erred by imposing a sentence above the Guidelines range.

No abuse of discretion occurred. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). After calculating the Guidelines range of 27–33 months, the court sentenced Woolridge to 46 months in prison. The court ably explained its reasons, pointing to Woolridge's numerous offenses, his pattern of illegally possessing firearms, and many prison rule infractions. Looking to Woolridge's statements at the sentencing hearing, the court also found that Woolridge would again "try to obtain a gun." R.39 at 26. Together, these reasons support the court's decision to vary the sentence upward in order to deter Woolridge, instill respect for the law, and protect the public.

Woolridge faults the court for considering his criminal history, pointing out that the Guidelines range accounts for that history already. But a sentencing court must look to a defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1); *United States v. Dunnican*, 961 F.3d 859, 881 (6th Cir. 2020). Saying otherwise "would have the practical effect of making the Guidelines again mandatory." *United States v. Tristan-Madrigal*, 601 F.3d 629, 636 n.1 (6th Cir. 2010). Besides, the court did not rely exclusively on Woolridge's criminal history. It also factored in Woolridge's conduct during incarceration, his behavior at sentencing, and his pattern of carrying firearms—all relevant, none fully captured in the Guidelines.

We affirm.