RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

AMADOR MAGALLON GUERRERO,

        *Defendant-Appellant.*

No. 24-5859

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cr-00118-1—William Lynn Campbell Jr., District Judge.

Argued: October 22, 2025

Decided and Filed: March 3, 2026

Before: STRANCH, BUSH, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kaycee L. Berente, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Emily E. Petro, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Kaycee L. Berente, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Emily E. Petro, Michael Tackeff, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

DAVIS, Circuit Judge. A jury convicted Amador Magallon Guerrero of multiple counts of conspiracy, drug trafficking, and money laundering. Prior to trial, Guerrero moved to suppress some of the evidence against him—including his confession and information retrieved from his cellphones. But his efforts were unsuccessful. He appeals the district court's denial of

two of his motions to suppress.  Guerrero argues that the district court erred in denying these motions because the record shows that agents violated his Fifth and Sixth Amendment rights in obtaining the statements comprising his confession, and they violated his Fourth Amendment rights in conducting the warrantless cellphone searches.  Because Guerrero has not established reversible error relating to either motion, we AFFIRM.

## I.  Facts and Procedural History

### A.  Factual Background

The Drug Enforcement Administration ("DEA") and the Metropolitan Nashville Police Department investigated Guerrero as a co-conspirator in a drug trafficking organization that was operating in the Middle District of Tennessee from July 2018 to February 2019.  Over the course of a ten-month investigation, law enforcement employed multiple investigative techniques, including among other things, placing wiretaps on Guerrero's phone, utilizing confidential informants, conducting controlled buys of narcotics, and engaging in electronic surveillance.

Based on the information gathered, a federal grand jury indicted Guerrero and three co-defendants.  The indictment charged Guerrero with eight counts: conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count One); conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count Two); distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count Three); possession with intent to distribute and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Four); aiding and abetting the attempted possession with intent to distribute 500 grams or more of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) (Count Five); aiding and abetting in possession with intent to distribute and distribution of 100 grams or more of heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) (Count Six); aiding and abetting in possession with intent to distribute and distribution of 100 grams or more of heroin, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) (Count Seven); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (h) (Count Eight).  An arrest warrant followed.

DEA Special Agents Ganon Hicks and Matthew Passmore arrested Guerrero at his home, where they found Guerrero partially clothed. After handcuffing him, the agents went to get Guerrero clothes from his bedroom closet. Before doing so, they asked Guerrero whether the closet contained any weapons or other items that could hurt them. Guerrero advised that there were two pistols in the closet. Once Guerrero dressed in the clothes agents had retrieved from the closet, the agents drove him to the DEA office. Meanwhile, Guerrero's wife gave verbal consent to search their house, which resulted in the seizure of two cellphones belonging to Guerrero.

Before Guerrero was booked and arraigned, the agents transported Guerrero to the DEA office where they questioned him in an interrogation room for about ninety minutes. The exchange, which was audio and video recorded, began with Hicks suggesting that they "get the admin stuff out of the way first[.]" (Interrogation Tr., R. 252-2, PageID 734). He asked for Guerrero's name, address, and whether he had a Social Security Number; his wife and children's names; his mother and father's names, ages, and place of residence in Mexico; and his siblings' names, ages, and places of residence. At that point, the following exchange occurred:

> **AGENT HICKS:** Okay. All right. Have you ever been arrested before?
>
> **GUERRERO:** Yeah, three years ago.
>
> **AGENT HICKS:** Okay. I don't know if they did this then, but I'll do it now. So, this is kind of like on T.V. --
>
> **GUERRERO:** Uh-huh (Affirmative).
>
> **AGENT HICKS:** -- when they read your rights, right?
>
> **GUERRERO:** Yeah, yeah.
>
> **AGENT HICKS:** So, you have the right to remain silent. Anything you say can and will be used against you in a court of law.
>
> **GUERRERO:** Uh-huh (Affirmative).
>
> **AGENT HICKS:** You have the right to have an attorney present with you during questioning. And if you can't afford an attorney, the Government will provide one for you.
>
> **GUERRERO:** Okay.
>
> **AGENT HICKS:** Okay. Do you understand those?
>
> **GUERRERO:** Yes.

(*Id.* at 739–40).  After some initial hesitation, Guerrero started answering the agents' questions about his involvement in drug trafficking.

Hicks then asked Guerrero for permission to search the two cellphones seized from his home.  Guerrero expressed reservations.  After some back and forth, Guerrero verbally consented to the search.  Then, based on Guerrero's indication that he "read better" in Spanish than in English, Passmore presented Guerrero with a consent form that was written in Spanish.  (*Id.* at 762).  Guerrero signed the form.  After receiving both verbal and written consent to search the phones, Hicks asked for the passcode to one of the phones, and Guerrero gave it to him.  During his interview with the agents, Guerrero confessed to participating in drug trafficking and described his role in the conspiracies.  And later, the DEA performed a full forensic search on the phones.

**B. Procedural History**

During the pretrial period, Guerrero filed four motions to suppress evidence.  Two are the subjects of this appeal: a motion to suppress incriminating statements Guerrero made during questioning following his arrest and a motion to suppress evidence obtained from the warrantless search of his cellphones.  The government opposed both motions.  After holding two evidentiary hearings, the district court denied each of Guerrero's motions.  The case later went to trial, and a jury convicted Guerrero on all counts.  The district court sentenced Guerrero to 168 months' imprisonment and five years of supervised release.

**II.  Standard of Review**

On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo, viewing the facts in the light most favorable to the government.  *United States v. Zabel*, 35 F.4th 493, 501 (6th Cir. 2022).  A finding of fact is clearly erroneous when, though some evidence may support it, the record leaves us "with the definite and firm conviction" that the district court made a mistake.  *United States v. Cleveland*, 907 F.3d 423, 430 (6th Cir. 2018) (citation omitted).

### III. Motion to Suppress Post-*Miranda* Statements

After receiving *Miranda* warnings, Guerrero confessed to buying, selling, and otherwise trafficking in various narcotics as well as sending money to and receiving money from other members of the conspiracy. At trial, the government played nine recorded clips of Guerrero's statements confessing these activities. Guerrero contends that the district court should not have allowed the government to use these statements because the agents violated his Fifth and Sixth Amendment rights in obtaining them. We address Guerrero's arguments in turn.

### A. Fifth and Sixth Amendment Standards

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In the seminal decision of *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established procedural safeguards to protect the core of the right against self-incrimination. These safeguards require law enforcement officers to inform suspects of their rights—colloquially known as *Miranda* warnings—before questioning. These warnings advise individuals that: (1) they have a right to remain silent, (2) anything they say can and will be used against them in a court of law, (3) they have the right to consult with a lawyer before interrogation and to have the lawyer present during interrogation, and (4) if they cannot afford an attorney, one will be appointed for them before questioning begins. *Id.* at 467–73.

*Miranda* is triggered whenever a person is subjected to custodial interrogation—i.e., subject to "express questioning or its functional equivalent." *McKinney v. Hoffner*, 830 F.3d 363, 371 (6th Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)); *Miranda*, 384 U.S. at 467–68. The functional equivalent of express questioning means "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. To protect against encroachments on this right, statements made during custodial interrogation are generally inadmissible "unless the defendant has first been apprized [sic] of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478–79).

*Miranda*'s third and fourth warnings about the right to counsel spring from the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel attaches "at or after the initiation of judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Moody*, 206 F.3d 609, 614 (6th Cir. 2000) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality opinion)). Once the right attaches, criminal defendants are entitled to the assistance of counsel during "critical stages" of the prosecution. *Turner v. United States*, 885 F.3d 949, 952 (6th Cir. 2018) (quoting *Missouri v. Frye*, 566 U.S. 134, 140 (2012), and *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009)). Interrogation is one such stage. *Montejo*, 556 U.S. at 786.

Here, it is undisputed that agents questioned Guerrero about his involvement in drug trafficking after placing him under arrest. So this questioning was custodial interrogation subject to the non-incrimination protection of the Fifth Amendment. And Sixth Amendment protection attached because he was indicted before the agents questioned him. We now turn to Guerrero's arguments on appeal.

Guerrero makes two related arguments as to why his statements should have been suppressed: The circumstances of his arrest were coercive, and because the agents gave him "midstream-*Miranda*" warnings, his post-*Miranda* statements were irrevocably tainted and therefore inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004). The district court found that Guerrero's statements were not coerced. And it distinguished Guerrero's interrogation from the "systematic, exhaustive" questioning challenged in *Seibert*. *United States v. Guerrero*, No. 19-cr-00118, 2023 WL 5916597, at *10 (M.D. Tenn. Sept. 11, 2023) (quoting *Seibert*, 542 U.S. at 616). Thus, it concluded that Guerrero's statements followed a knowing and voluntary waiver of Fifth and Sixth Amendment rights. Neither decision is reversible error.

**B. Coercion**

Guerrero casts his pre-*Miranda* interactions with law enforcement as "inherently coercive" because agents arrested him at home early in the morning, did not Mirandize him until

they reached the DEA office, and questioned him in English after he initially did not want to speak. As a preliminary matter, although the parties spend much time probing whether the agents' pre-*Miranda* questions to Guerrero violated *Miranda*, none of Guerrero's statements from those interactions were introduced at trial. They thus could not independently provide a basis for a constitutional violation. *See United States v. Patane*, 542 U.S. 630, 641 (2004). So we consider those earlier circumstances only in the context of Guerrero's assertion that they have some bearing on whether his subsequent confession was coerced and therefore inadmissible. *See United States v. Binford*, 818 F.3d 261, 270–71 (6th Cir. 2016); *United States v. Woolridge*, 64 F.4th 757, 760 (6th Cir. 2023).

Post-*Miranda* statements to law enforcement officials are admissible so long as they follow a knowing, voluntary, and intelligent waiver of the rights that the warnings were formulated to protect. *Binford*, 818 F.3d at 271; *Miranda*, 384 U.S. at 444. Confessions obtained through official coercion, however, do not meet this standard. *See United States v. Ray*, 803 F.3d 244, 266 (6th Cir. 2015). To find officials' conduct coercive, three things must be true: The conduct "was objectively coercive," the alleged coercion "was sufficient to overbear the defendant's will," and the officials' actions were "the crucial motivating factor in the defendant's decision" to speak. *Binford*, 818 F.3d at 271 (citing *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)). The government bears the burden of proving by a preponderance of the evidence that a confession was made without coercion. *Id.*

The government has satisfied its burden here. The agents' actions in arresting Guerrero at home early in the morning and declining to Mirandize him immediately upon arrest were permissible law enforcement strategies. *See United States v. Crowder*, 62 F.3d 782, 788 (6th Cir. 1995) ("A legal arrest in the home does not constitute evidence of coercion."); *Montejo*, 556 U.S. at 790 (rejecting a rule that "would prevent police-initiated interrogation entirely once the Sixth Amendment right attaches"). And questioning Guerrero after he initially expressed reluctance to speak is not enough to show that his will was overborne. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973) (holding that officers do not coerce a suspect simply because they successfully persuaded the suspect to waive a right after an initial refusal). On that score, we agree with the district court that "[t]he fact that Guerrero was initially hesitant to speak

with officers . . . but nevertheless decided to speak, does not indicate that his statements were coerced." *Guerrero*, 2023 WL 5916597, at \*9. Finally, Guerrero suggests that questioning him in his non-native language was coercive. But the agents knew that Guerrero was bilingual because, by the time they interrogated him, they had been intercepting his communications for months. And Guerrero exhibited no difficulty in understanding the agents during their interactions with him. Absent any indication that Guerrero struggled to understand the English conversation with the agents, we do not perceive objectively coercive action that sufficiently overbore Guerrero's will.

Still, Guerrero points to other aspects of his pre-*Miranda* questioning that he says "bled" into and therefore tainted his post-*Miranda* questioning as objectively coercive. (Appellant's Br., ECF 26, 15 n.2, 20–21). Specifically, he posits that the agents' inquiry about the presence of weapons at his home violated *Miranda's* requirements because the question was designed to elicit inculpatory information. (*Id.* at 18–21). And he disagrees with the district court's conclusion that to the extent that the agents' earlier questioning may have crossed any line, Guerrero's pre- and post-warning experiences were sufficiently distinct to afford him a true choice between speaking and waiving his rights. (*Id.*).

True, officers violate the Sixth Amendment "whenever the State intentionally creates a situation likely to induce a defendant to make incriminating statements without the assistance of counsel, or knowingly exploits a situation in order to obtain incriminating information from a defendant without counsel being present." *Ayers v. Hudson*, 623 F.3d 301, 309 (6th Cir. 2010) (citation modified). But here, we question the premise that the agents' inquiries were designed to draw out inculpatory information. The agents asked Guerrero one question at home: whether the closet contained weapons or anything that could hurt the agents. Later—also during the pre-*Miranda* part of the interrogation—agents asked for his name, address, and whether he had a Social Security Number; his wife and children's names; his mother and father's names, ages, and place of residence in Mexico; and his siblings' names, ages, and places of residence. In context, it is not clear that any of these questions were designed to induce an incriminating response. Yet, even accepting without deciding that this earlier questioning may have gone too far,

we agree with the district court that the circumstances of this case do not render any waiver of his rights to be unknowing, unintelligent, or involuntary.

## C. "Midstream-*Miranda*" Warnings

Guerrero argues that, because the agents sandwiched his *Miranda* rights in between their initial questioning (at his house and during the early minutes of his arrival at the DEA office) and their lengthier questioning that took place later (in a DEA interrogation room), his warnings were ineffective. He relies on the Supreme Court's decision in *Seibert* for this argument. *Seibert* addressed an interrogation approach—dubbed variously "question-first," "midstream-*Miranda*," and "*Miranda*-in-the-middle"—in which interrogating officers withhold *Miranda* warnings until they first have a confession in hand. 542 U.S. at 613–14. To illustrate: Officers interrogated Patrice Seibert for thirty to forty minutes until she confessed. *Id.* at 604–05. Following a twenty-minute break, the officers Mirandized Seibert, had her sign a waiver, and picked up where the interview had left off. *Id.* at 605. A plurality of the Court determined that "[t]he object of question-first [was] to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. Under those circumstances, the *Miranda* warnings "could not effectively comply with *Miranda's* constitutional requirement." *Id.* at 604. So Seibert's confession was not admissible. *Id.*

That said, "midstream-*Miranda*" warnings do not automatically render inadmissible a post-*Miranda* confession. Take, for example, a suspect who voluntarily speaks before getting Mirandized. If police administer *Miranda* warnings after a suspect starts to talk, a confession would still be admissible unless it was coerced. *See Oregon v. Elstad*, 470 U.S. 298, 309–11 (1985); *Woolridge*, 64 F.4th at 760. The same is true when a suspect does not confess until after he is Mirandized. In that case, "there is no concern . . . that police gave [the suspect] *Miranda* warnings and then led him to repeat an earlier [] confession, because there [would be] no earlier confession to repeat." *Bobby v. Dixon*, 565 U.S. 23, 31 (2011) (per curiam).[1]

---

[1]*Dixon* is a habeas case in which the underlying state court's judgment received deference due under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.* But this distinction does not diminish the instructive value of that decision.

That is the case here. The agents could not have pressured Guerrero to repeat any confession about his crimes because when they administered his *Miranda* warnings, he had not yet confessed. Indeed, after Mirandizing Guerrero, the only matter the agents revisited was unrelated to the charges in his indictment. Specifically, they asked Guerrero where he bought the firearms that were at his house. But that question had no bearing on his culpability for the charged offenses, and his answer was not used at trial. Short of some potentially incriminating nexus between the pre- and post-*Miranda* questioning, *Seibert*'s applicability is questionable. After all, the primary ill that case seeks to remedy—law enforcement's efforts to transform an illegally obtained confession into a legal one—is not at issue where there is no earlier confession.

Setting aside these reservations, we agree with the government that, on balance, *Seibert*'s factors tip in the government's favor. Under *Seibert*, courts consider: (1) "the completeness and detail of the questions and answers in the first round of interrogation"; (2) "the overlapping content of the two statements"; (3) "the timing and setting of the first and the second" rounds; (4) "the continuity of police personnel"; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615; *see also Ray*, 803 F.3d at 272–73 (adopting the plurality test).

Here, the first and second factors weigh against Guerrero. As discussed, there was scant overlap between the issues discussed during the pre- and post-*Miranda* questioning. Conversely, the third and fourth factors skew in the other direction. When pre- and post-*Miranda* questioning happens without any notable break in time or change in location, the third factor favors suppression. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 427 (6th Cir. 2008). Although Guerrero's pre-*Miranda* questioning was broken up by the agents' transporting him from his house to the DEA office, the transition from unwarned to warned questioning occurred without any break or location change. So the third factor favors him. And because the same agents arrested him and conducted both sets of questioning, the fourth factor also favors Guerrero.

The fifth factor—continuity of questioning—implicates both the content and structure of the agents' questions. For instance, language linking a post-warning conversation to a previous, unwarned one could indicate that the second exchange is a continuation of the first. *See United States v. McConer*, 530 F.3d 484, 497–98 (6th Cir. 2008) (telling a suspect that "they would 'get

this down on paper later'"). Likewise with questions that follow logically from prior statements, *see United States v. Ray*, 690 F. App'x 366, 376 (6th Cir. 2017) (asking multiple questions that were "derivative of [] earlier admissions"), or pick up where earlier questions "left off," *United States v. Ashmore*, 609 F. App'x 306, 317 (6th Cir. 2015). Here, the change in subject matter and absence of language suggesting that officers were seeking to clarify or expound on prior statements (save a single question about the firearm) suggests that they did not treat the questioning as continuous. So the government likely carries the day on the fifth factor. All things considered, then, *Seibert*'s factors would not support suppression.

## D. Sufficiency of *Miranda* Warnings

Guerrero next challenges the adequacy of the *Miranda* warnings he received. Specifically, he argues that the third warning did not reasonably convey his right to consult counsel before and during questioning, and that the fourth warning improperly communicated his right to have counsel appointed for him. These purported deficiencies, Guerrero says, negated his ability to intelligently and voluntarily waive his right to counsel. The district court found that the warnings sufficiently informed Guerrero of his rights, so his decision to waive his rights by answering the agents' questions was valid.

An accused person has an unequivocal right to an attorney before and during questioning. This right is "a fundamental component" of "our whole system of adversary criminal justice." *United States v. Cronic*, 466 U.S. 648, 653 (1984); *Kirby*, 406 U.S. at 689. At its simplest, the pretrial right to counsel is meant to "minimize [the] imbalance" between a criminal defendant and his "expert adversary": the state. *United States v. Ash*, 413 U.S. 300, 309–10 (1973). The equalizing effect of the Sixth Amendment right to counsel ensures that pretrial interrogations abide by the "basic dictates of fairness." *Massiah v. United States*, 377 U.S. 201, 205 (1964). Faced with the government's expertise and resources, many criminal defendants lack the legal acumen to navigate the criminal legal system alone. *Johnson v. Zerbst*, 304 U.S. 458, 462–63 (1938); *Kirby*, 406 U.S. at 689–90; *McNeil v. Wisconsin*, 501 U.S. 171, 177–78 (1991). This asymmetry is even more pronounced before trial, when consultation with counsel is "perhaps the most critical." *Powell v. Alabama,* 287 U.S. 45, 57 (1932). Without these pretrial protections,

the right to have counsel at trial would be "a very hollow thing." *Escobedo v. Illinois*, 378 U.S. 478, 487 (1964) (citation modified).

As "an absolute prerequisite to interrogation," a person held in custody and interrogated "must be clearly informed" of two aspects of the right to consult counsel: the "right to consult with counsel *prior* to questioning" and "to have counsel present *during* any questioning." *Miranda*, 384 U.S. at 470–71 (emphasis added). That said, *Miranda* is not a "constitutional straitjacket," *id.* at 467, so officials need not follow the warnings to a tee. *California v. Prysock*, 453 U.S. 355, 360 (1981); *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989); *Florida v. Powell*, 559 U.S. 50, 60 (2010). Rather, the *Miranda* warnings are designed to ensure that a person accused of a crime, facing the "compulsion inherent in custodial interrogation," is "advised of and understands" her constitutional rights. *Berghuis v. Thompkins*, 560 U.S. 370, 382–83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 427 (1986)). So courts center their analyses on whether the warnings "reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth*, 492 U.S. at 203 (quoting *Prysock*, 453 U.S. at 361).

To be sure, warnings may deviate from *Miranda*'s blueprint by addition or omission and still be deemed acceptable. A trio of Supreme Court cases—*Prysock*, *Duckworth*, and *Powell*— illustrate how modified right-to-counsel warnings may be constitutionally adequate. *Duckworth* upheld an addition. Instead of telling the suspect that he had "the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one," police told Duckworth that "he had the right to speak to an attorney before and during questioning," regardless of whether he could afford one. 492 U.S. at 203–04. And though they "could not provide [Duckworth] with a lawyer," officers told him that a lawyer "would be appointed 'if and when [he went] to court.'" *Id.* at 203. This language reflected the fact that stationhouse lawyers were not producible on call. *Id.* at 204. And most importantly, the warnings "accurately described the procedure for the appointment of counsel in Indiana." *Id.*

*Prysock* dealt with an omission. Police told Prysock that he had the right to talk to a lawyer before questioning, to have the lawyer present during interrogation, and that he had "the right to have a lawyer appointed" at no cost. 453 U.S. at 357. But he was not told that an attorney would be appointed before questioning. Yet because "nothing in the warnings . . .

suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general," the warnings sufficed. *Id.* at 360–61.

*Powell* presented a new wrinkle. Whereas Prysock and Duckworth were informed of their rights to consult counsel before and during questioning, *id.* at 356, 360–61; *Duckworth*, 492 U.S. at 202, 206, Powell was not. The issue in *Powell* was whether telling a suspect that he had the right to talk to a lawyer *before* questioning—without explaining that he had a right to an attorney *during* questioning—sufficiently conveyed the right to counsel. The Supreme Court held that Powell's warnings were sufficient: The warnings did not erroneously convey to the defendant that he could consult an attorney *only* "before" the interrogation began. *Powell*, 559 U.S. at 55. Instead, the phrase "before any questioning" indicated when the right to counsel began—not its duration. *Id.* at 63. Moreover, the inclusion of the "catchall" provision, emphasizing that the suspect could invoke his rights "at any time" during the interview, had to be considered together with the advice about access to counsel before questioning. *Id.* at 55, 63. Since the right to counsel began before interrogation, and Powell could invoke this right "at any time during the interview," these admonitions together conveyed Powell's right to have an attorney present throughout questioning, not just at the outset. *Id.*

1. Right to Counsel Before Questioning

We have not squarely faced the question that Guerrero raises here. But we confronted a similar issue in *United States v. Clayton*, 937 F.3d 630 (6th Cir. 2019). There, an officer reading aloud from the police department's standard *Miranda* form told the defendant: "[Y]ou have the right to talk to a lawyer before we ask you any questions." *Id.* at 634. The officer omitted the second half of this sentence: "and to have him/her with you during questioning." *Id.* On *Powell*'s authority, *Clayton* confirmed that the officer's phrasing adequately informed the defendant of his "right to consult with an attorney, as required by *Miranda*, and that the right began immediately, before any questions may be asked." *Id.* at 639 (citing *Powell*, 559 U.S. at 64). We explained that the officer's advice—that the defendant had a right to get an attorney appointed before questioning ensued—employed "virtually the same phrasing" as *Miranda*'s "prior to any questioning" and clearly described the starting point for his right to counsel. *Id.* at 639–40 (citing *Miranda*, 384 U.S. at 479). And we reasoned that it would be "counterintuitive"

to conclude that the right terminated once questioning began, because the right to counsel "before" questioning logically includes the right "during" questioning. *Id.* Therefore, the defendant's assertion that the advice was insufficient to convey his right to counsel during questioning failed.

Guerrero received the converse of the *Powell* and *Clayton* warnings: Hicks told Guerrero that he had a right to an attorney *during* questioning, but did not tell him that the right attached *before* questioning. The government argues that "it would have been commonsense for Guerrero to conclude that, if he had 'the right to have an attorney present with [him] during questioning' . . . then he could speak with that attorney before interrogation began." (Appellee's Br., ECF 36, 22). But Guererro asserts that advising a suspect that he has a right to counsel during questioning does not lead to a commonsense conclusion that one is also entitled to counsel prior to questioning. Relying on *Miranda* and *Powell*, moreover, we explained in *Clayton* that the "before" and "prior to" wording is critical to a defendant's understanding of when the right to counsel is triggered. 937 F.3d at 640. There is therefore good reason to question the "commonsense" conclusions that the government posits should be reached under these facts. But in the end, we need not determine whether the district court erred in finding there was no violation. For, as we discuss in subsection E, even assuming without deciding that the district court erred, any such error was harmless. Before moving on to our harmlessness analysis, however, we first consider another of Guerrero's bases for challenging the sufficiency of his warnings—the advice he received about appointment of counsel.

2. Right to Appointment of Counsel

Guerrero's claim that the warnings he received were deficient because the agents told him that "the Government" would appoint him a lawyer is meritless. As above, we ask whether the warning given "reasonably convey[ed]" the right. *Duckworth*, 492 U.S. at 203 (citation modified). Here, Guerrero had the right "to have a lawyer appointed at no cost if he could not afford one." *Prysock*, 453 U.S. at 361. And "it is the Government's obligation to furnish him with a lawyer." *Schneckloth*, 412 U.S. at 236. Warnings that accurately describe the procedure for appointing counsel necessarily inform a suspect of his right to have counsel appointed for his defense. *See Duckworth*, 492 U.S. at 203–04.

The warning given here in no way obscured the contours of Guerrero's right to have counsel appointed. Hicks told Guerrero that if he "[could not] afford an attorney, the Government w[ould] provide one for [him]." (Interrogation Tr., R. 252-2, PageID 739). That this language does not parrot *Miranda* to the letter is inconsequential. We do not "examine *Miranda* warnings as if construing a will or defining the terms of an easement." *Duckworth*, 492 U.S. at 203. And here, Guerrero has not convinced us that this warning was constitutionally deficient.

**E. Harmless Error**

In view of the purported deficiency in his *Miranda* warnings, Guerrero asks us to vacate his conviction because his confession should have been excluded at trial. The government argues that any error was harmless considering the overwhelming evidence it presented of Guerrero's guilt. We agree with the government that we review for harmlessness. *See United States v. Zakhari*, 85 F.4th 367, 378 (6th Cir. 2023). Guerrero suggests structural error and contends that harmless-error review does not apply to Sixth Amendment violations. But his assertion is overbroad. Although "Sixth Amendment violations that pervade the entire proceeding" "can never be considered harmless," *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988), we normally review confessions obtained in violation of the Sixth Amendment for harmless error. *Ayers*, 623 F.3d at 317 n.12 (citing *Milton v. Wainwright*, 407 U.S. 371 (1972)). Guerrero's challenge involves the latter, not the former. And that makes sense. A *Miranda* violation is an error in the admission of certain evidence, and evidentiary errors—even those of constitutional character—are generally reviewed for harmlessness. *See, e.g.*, *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020) ("Confrontation Clause violations do not require automatic reversal[] and are instead subject to harmless-error analysis."); *United States v. Campbell*, 317 F.3d 597, 609 (6th Cir. 2003) ("Therefore, to the extent the district court's admission of the shotgun shells was more prejudicial than probative, the error was harmless.").

Considering the entirety of evidence against Guererro, the admission of his post-*Miranda* statements was harmless.

The government bears the burden of showing that improperly admitted evidence was harmless, and "if we are uncertain, the tie goes to the criminal defendant." *United States v. Grogan*, 133 F.4th 553, 564 (6th Cir. 2025) (citation modified). "A confession, unlike other evidence, is 'extremely probative of guilt,'" and to determine whether an improperly admitted confession is harmless, the government must therefore show "beyond a reasonable doubt that the jury would have returned a verdict of guilty" had the confession been excluded. *Id.* at 565; *United States v. Wolf*, 879 F.2d 1320, 1324 (6th Cir. 1989). Harmless-error review requires us to weigh the prejudicial effect of the improperly admitted evidence against the rest of the evidence presented to the jury. *Grogan*, 133 F.4th at 563–64. Though confessions are undoubtedly prejudicial, *see Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), we will not vacate a conviction if the other evidence admitted against the defendant was "overwhelmingly indicative of guilt." *Grogan*, 133 F.4th at 563–64.

The government has met its burden here. The trial court admitted seventy-eight exhibits against Guerrero. Eighteen of those—nine clips with accompanying transcripts—were from the custodial interview. That evidence was not admitted until the afternoon of the second day of trial. Before then, however, the jury heard 19 clips of intercepted calls between Guerrero and co-conspirators and 11 calls involving controlled and undercover buys of narcotics. The jury also considered 16 text message conversations between Guerrero and co-conspirators, five videos of a controlled buy, nine surveillance-camera videos, and six separate exhibits of drugs recovered by DEA agents—heroin, cocaine, and methamphetamine. Under these circumstances, we are convinced that the evidence of Guerrero's guilt was overwhelming even without his confession. This error, therefore, was harmless.

## IV. Motion to Suppress Cellphone-Search Evidence

Guerrero also appeals the denial of his motion to suppress evidence obtained from warrantless searches of his cellphones. He argues that agents unlawfully coerced him to consent to the searches. The district court found that Guerrero voluntarily consented to the searches. We review the district court's legal conclusion de novo and its factual findings for clear error. *United States v. Fletcher*, 978 F.3d 1009, 1014 (6th Cir. 2020). We agree with the district court

that Guerrero's consent was voluntary.  Accordingly, we uphold the denial of his motion to suppress.

The Fourth Amendment prohibits unreasonable searches.  U.S. Const. amend. IV. Nevertheless, "a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (citing *Davis v. United States*, 328 U.S. 582, 593–94 (1946)).  The burden rests with the government to demonstrate that any such consent was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (citation modified). We evaluate the totality of the circumstances to determine if the government met this burden. *Harris v. Klare*, 902 F.3d 630, 639 (6th Cir. 2018).  Relevant factors include the defendant's personal characteristics, the circumstances of the encounter, and any use of coercive conduct by the police. *See United States v. Parrish*, 942 F.3d 289, 294 (6th Cir. 2019).

Guerrero gave the agents both verbal and written consent to search his phones.  Guerrero initially expressed reservations about letting the agents search his phones, but he eventually relented.  Passmore told Guerrero that the agents would seek a search warrant if he did not give them permission.  After further discussion, Hicks asked Guerrero point-blank: "Can I look through the phone or not?" (Interrogation Tr., R. 252-2, PageID 755).  Guerrero said yes, they could search the flip phone.  And after a brief exchange about personal information on his smartphone, Guerrero gave them permission to search it, too.  Then Guerrero signed a consent form that authorized the agents to search both phones.  Though the entire interrogation was conducted in English, Passmore gave Guerrero a Spanish-language consent form after Guerrero indicated that he "read better" in Spanish than in English. (*Id.* at PageID 762).  Right after signing the form, Guerrero provided the passcode to unlock his smartphone.

The totality of the circumstances does not indicate coercion.  Guerrero was thirty years old at the time, suggesting neither inexperience and naivete nor any age-related cognitive decline.  Throughout the approximately 90-minute interrogation leading up to the request to search the phones, he and the agents sat in armchairs near one another.  At times, Guerrero leaned over his chair so that he and Hicks could look at his phone together.  The tone of the

interrogation was conversational. Nobody raised their voice. Guerrero was not handcuffed, and he did not try to leave. The agents, for their part, never touched Guerrero or drew their weapons.

We regularly uphold searches conducted under similar circumstances. Take *Parrish*, which involved a "low key" interview "conducted in a cooperative spirit." 942 F.3d at 294. Just like Guerrero, during the interview leading up to the search of his phone, Parrish was not restrained, he did not try "to leave or otherwise end the interview," and he "worked with the officers to remove the passcode from his phone." *Id.* A suspect's decision to cooperate may suggest voluntary consent. *See United States v. Tellez*, 86 F.4th 1148, 1152 (6th Cir. 2023) (describing defendant's behavior as "calm and cooperative"); *United States v. Blomquist*, 976 F.3d 755, 760 (6th Cir. 2020) (defendant "spoke cooperatively" with officers). Accordingly, we concluded that the agents' search of Parrish's phone did not violate the Fourth Amendment because his consent was voluntary. *Parrish*, 942 F.3d at 294.

Guerrero faults three aspects of his interrogation. First, he casts the entire interrogation as coercive because the agents continued to ask for his consent after he initially avoided their request. But follow-up questions are not necessarily coercive. And he cites no authority to support his view that they crossed the boundary into coercion here. Second, Guerrero claims that threatening to get a search warrant was coercive. Binding precedent forecloses this argument. *See, e.g.*, *United States v. Gardner*, 887 F.3d 780, 784 (6th Cir. 2018). Third, Guerrero takes issue with the Spanish-language consent form. But that argument gets him nowhere. Since Guerrero's first language is Spanish, it is difficult to imagine how giving him a form to sign that was written in Spanish could undermine his consent—especially when he expressly told agents that he read better in Spanish.

Seeing no impermissible interrogation tactics here, and after evaluating the totality of the circumstances surrounding the interrogation, we hold that the district court did not clearly err by finding that Guerrero consented. It properly denied his motion to suppress on this basis.

Even if we were to conclude that Guerrero received insufficient *Miranda* warnings, such a conclusion would not alter our analysis. That is because, to use a familiar metaphor, a *Miranda* violation is not a tree that bears automatically inadmissible fruit. *Patane*, 542 U.S. at 641–42;

*Elstad*, 470 U.S. 306–09 (collecting authority).   We thus reject Guerrero's attempt to tie insufficient *Miranda* warnings to his decision to consent to the searches.   We long ago determined that *Miranda* violations do not "taint" later-obtained consent to search.  *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1519 (6th Cir. 1988).   And conflating Fourth and Fifth Amendment analyses risks diminishing the "wholly different" protections that each Amendment guarantees.  *Schneckloth*, 412 U.S. at 242.[2]

## V.  Conclusion

We **AFFIRM**.

---

[2]We also note that Guerrero points to no evidence from either of the searched phones that was later used at trial.  While we decide the issue on other grounds, we are hard-pressed to see how the district court's failure to suppress evidence that was never used against him could result in reversible error following trial.  *See United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004) (evidence "not offered at trial . . . could not have affected the jury's verdict").